OPINION OF THE COURT
Ciparick, J.
Thirteen years after we decided Board of Educ., Levittown Union Free School Dist. v Nyquist (57 NY2d 27) (hereinafter Levittown), we are again faced with a challenge to the constitutionality of New York State’s public school financing system. We are called upon to decide whether plaintiffs’ (Campaign for Fiscal Equity et al.) complaint pleads viable causes of action under the Education Article of the State Constitution, the Equal Protection Clauses of the State and Federal Constitutions, and title VI of the Civil Rights Act of 1964 and its implementing regulations.
Judges Titone, Bellacosa, Smith and I conclude that the nonschool board plaintiffs plead a sustainable claim under the Education Article.[1] Judge Levine concurs in a separate opinion. The Court is unanimous that, as to the nonschool board plaintiffs, a valid cause of action has been pleaded under title Vi’s implementing regulations. The remainder of this complaint should be dismissed.
I.
Plaintiffs in this case are (1) Campaign for Fiscal Equity, Inc. (CFE), a not-for-profit corporation whose membership consists of community school boards, individual citizens, and a number of parent advocacy organizations; (2) 14 of New York City’s 32 school districts; and (3) individual students who attend New York City public schools and their parents. The defendants are New York State, the Governor, the Commissioner of Education, the Commissioner of Taxation and Finance, and the Majority and Minority Leaders of the Senate and Assembly.
Plaintiffs commenced this action seeking a declaratory judgment against the State defendants, claiming that the State’s *313 public school financing system is unconstitutional under the Education Article of the State Constitution (art XI, § 1), the Equal Protection Clauses of the State (art I, § 11) and Federal Constitutions (US Const 14th Amend), the Antidiscrimination Clause of the State Constitution (art I, § 11),[2] and is unlawful under title VI of the Civil Rights Act of 1964 (42 USC § 2000d et seq.) and the United States Department of Education’s regulations implementing title VI (34 CFR 100.3 [b] [2]).
Three defendants — the State of New York, the Senate Majority Leader, and the Assembly Minority Leader — brought the instant motion to dismiss under CPLR 3211 (a) (3) and (7), contending "that certain plaintiffs lack the right to bring this action and that the complaint fails to state a cause of action.”
Supreme Court granted defendants’ motion to the extent of dismissing all claims asserted on behalf of the plaintiff school districts on the ground that they lacked the legal capacity to sue.[3] As to the remaining plaintiffs — CFE and the individual students and parents — the court dismissed their equal protection and title VI claims for failure to state a cause of action, but ruled that the complaint stated valid claims under the Education Article, the Antidiscrimination Clause of the State Constitution, and title Vi’s implementing regulations.
The Appellate Division modified the order of Supreme Court by fully granting defendants’ motion to dismiss and dismissing the claims made under the Education Article, the Antidiscrimination Clause, and the title VI regulations for failure to state causes of action. The Appellate Division concluded that plaintiffs’ allegations that reduced resources have resulted in the failure to provide New York City school children with an opportunity to receive a minimally adequate education were conclusory in nature, and, in any event, embodied a theory "virtually identical to that advanced, fully tried and ultimately rejected on appeal in Levittown. ” (205 AD2d 272, 276.) The Court also concluded that the prohibition in title Vi’s regulations against methods of administration which have an unlawful impact on racial and ethnic minorities was not violated by the State’s role in allocating a lump sum of education aid to the New York City school system.
*314 II. — Education Article
The first cause of action in plaintiffs’ complaint essentially alleges that the State’s educational financing scheme fails to provide public school students in the City of New York, including the individual plaintiffs herein, an opportunity to obtain a sound basic education as required by the State Constitution.
Discussion of the constitutional issues raised in this case necessarily takes place against the backdrop of our decision in Levittown (57 NY2d 27, supra). The Levittown plaintiffs consisted of 27 property-poor school districts, boards of education of 4 of the State’s 5 largest cities (including New York City), and a number of school children and their parents residing in the property-poor school districts. After a 122-day trial, Supreme Court issued a judgment declaring that the 1974 school financing system violated the Equal Protection Clauses of the Federal and State Constitutions and the Education Article of the State Constitution. The Appellate Division agreed, except as to the Federal equal protection claim. This Court modified, by substituting a declaration "that the present statutory provisions for allocation of State aid to local school districts for the maintenance and support of elementary and secondary public education are not violative of either Federal or State Constitution.” (Id., at 50.)
We rejected the Levittown plaintiffs’ Federal equal protection challenge based on the decision of the Supreme Court of the United States in San Antonio School Dist. v Rodriguez (411 US 1) (id., at 41). The State equal protection challenge was rejected after we applied the rational basis test (id., at 43-46). Finally, the Education Article challenge was found lacking, as the plaintiffs advanced no claim of a deprivation of "minimal acceptable facilities and services” or "a sound basic education” (id., at 47, 48).
Article XI, § 1 of the State Constitution, the Education Article, mandates that "[t]he legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated.” In Levittown, this Court examined the Education Article’s language and history and rejected the plaintiffs’ contention that the provision was intended to ensure equality of educational offerings throughout the State (57 NY2d 17, 47, supra). Rather, we stated, "[wjhat appears to have been contemplated when the Education Article was adopted at the 1894 Constitu *315 tional Convention was a State-wide system assuring minimal acceptable facilities and services in contrast to the unsystematized delivery of instruction then in existence within the State.” (Id. [emphasis added].) In order to satisfy the Education Article’s mandate, the system in place must at least make available an "education”, a term we interpreted to connote "a sound basic education” (id., at 48).
The Court in Levittown acknowledged the existence of "significant inequalities in the availability of financial support for local school districts, ranging from minor discrepancies to major differences, resulting in significant unevenness in the educational opportunities offered.” (Id., at 38.) Nonetheless such unevenness of educational opportunity did not render the school financing system constitutionally infirm, unless it could be shown that the system’s funding inequities resulted in the deprivation of a sound basic education (id., at 47-48).
The gravamen of the plaintiffs’ complaint in Levittown was that "property-rich districts have an ability to raise greater local tax revenue enabling them to provide enriched educational programs beyond the fiscal ability of the property-poor districts.” (57 NY2d, at 36.) Indeed, we specifically noted:
"No claim is advanced in this case, however, by * * * plaintiffs * * * that the educational facilities or services provided in the school districts that they represent fall below the State-wide minimum standard of educational quality and quantity fixed by the Board of Regents; their attack is directed at the existing disparities in financial resources which lead to educational unevenness above that minimum standard.” (Id., at 38.)
We recognized in Levittown that the Education Article imposes a duty on the Legislature to ensure the availability of a sound basic education to all the children of the State. Contrary to the dissenting expression of Judge Simons, we are unable to adopt the view that the constitutional language at issue is, in effect, hortatory. Indeed, we should not do so in the face of Levittown’s unambiguous acknowledgment of a constitutional floor with respect to educational adequacy. We conclude that a duty exists and that we are responsible for adjudicating the nature of that duty.
In this case, the principal premise underlying the Appellate Division’s dismissal of plaintiffs’ Education Article cause of action — that it is "virtually identical” to the theory tried and *316 rejected, in Levittown — is flawed and fails. Plaintiffs advance the very claim we specifically stated was not before us in Levittown, i.e., that minimally acceptable educational services and facilities are not being provided in plaintiffs’ school districts. Levittown does not foreclose plaintiffs’ Education Article claim. Rather, a fair, contextual reading of that case compels the contrary conclusion. The Court there manifestly left room for a conclusion that a system which failed to provide for a sound basic education would violate the Education Article (id., at 48).
Having concluded that Levittown is not an obstacle to plaintiffs’ Education Article claim, we turn next to the crucial question: whether plaintiffs have properly stated a cause of action under the Education Article.
That Article requires the State to offer all children the opportunity of a sound basic education (id.).[4] Such an education should consist of the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury. If the physical facilities and pedagogical services and resources made available under the present system are adequate to provide children with the opportunity to obtain these essential skills, the State will have satisfied its constitutional obligation. As we stated in Levittown,
"The Legislature has made prescriptions (or in some instances provided means by which prescriptions may be made) with reference to the minimum number of days of school attendance, required courses, textbooks, qualifications of teachers and of certain nonteaching personnel, pupil transportation, and other matters. If what is made available by this system (which is what is to be maintained and supported) may properly be said to constitute an education, the constitutional mandate is satisfied.” (57 NY2d, at 48.)
*317 The State must assure that some essentials are provided. Children are entitled to minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn. Children should have access to minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks. Children are also entitled to minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies, by sufficient personnel adequately trained to teach those subject areas.
We note that plaintiffs, throughout their complaint, rely on the minimum State-wide educational standards established by the Board of Regents and the Commissioner of Education, a reliance directly traceable to certain language in Levittown (see, 57 NY2d, at 38). Contrary to Judge Simons, we see no reason to penalize plaintiffs for referencing those standards in this manner. Construing the allegations liberally and in whole, as we must (see, Leon v Martinez, 84 NY2d 83, 87-88), there can be no question that the pertinent pivotal claim made here is that the present financing system is not providing City school children with an opportunity to obtain a sound basic education. However, because many of the Regents’ and Commissioner’s standards exceed notions of a minimally adequate or sound basic education — some are also aspirational— prudence should govern utilization of the Regents’ standards as benchmarks of educational adequacy. Proof of noncompliance with one or more of the Regents’ or Commissioner’s standards may not, standing alone, establish a violation of the Education Article.
Plaintiffs also rely on standardized competency examinations established by the Regents and the Commissioner to measure minimum educational skills (see, 8 NYCRR 100.3 [b] [2]; 100.5 [a] [4]). Performance levels on such examinations are helpful but should also be used cautiously as there are a myriad of factors which have a causal bearing on test results.
We do not attempt to definitively specify what the constitutional concept and mandate of a sound basic education entails. Given the procedural posture of this case, an exhaustive discussion and consideration of the meaning of a "sound basic education” is premature. Only after discovery and the development of a factual record can this issue be fully evaluated and resolved. Rather, we articulate a template reflecting our judgment of what the trier of fact must consider in determin *318 ing whether defendants have met their constitutional obligation. The trial court will have to evaluate whether the children in plaintiffs’ districts are in fact being provided the opportunity to acquire the basic literacy, calculating and verbal skills necessary to enable them to function as civic participants capable of voting and serving as jurors.
A relevant issue at this point is whether plaintiffs can establish a correlation between funding and educational opportunity. In order to succeed in the specific context of this case, plaintiffs will have to establish a causal link between the present funding system and any proven failure to provide a sound basic education to New York City school children. However, we believe that Judge Simons’ extended causation discussion (see, dissenting in part opn, at 339-340) is premature given the procedural context of this case.
We turn next more specifically to the complaint. In considering the sufficiency of a pleading subject to a motion to dismiss for failure to state a cause of action under CPLR 3211 (a) (7), our well-settled task is to determine whether, "accepting as true the factual averments of the complaint, plaintiff can succeed upon any reasonable view of the facts stated” (People v New York City Tr. Auth., 59 NY2d 343, 348; see, Jiggetts v Grinker, 75 NY2d 411, 414-415; 219 Broadway Corp. v Alexander’s, Inc., 46 NY2d 506, 509). We are required to accord plaintiffs the benefit of all favorable inferences which may be drawn from their pleading, without expressing our opinion as to whether they can ultimately establish the truth of their allegations before the trier of fact (see, 219 Broadway, supra, at 509; Underpinning & Found. Constructors v Chase Manhattan Bank, 46 NY2d 459; Morone v Morone, 50 NY2d 481). Only recently we recognized the right of plaintiffs "to seek redress, and not have the courthouse doors closed at the very inception of an action, where the pleading meets a minimal standard necessary to resist dismissal of a complaint.” (Armstrong v Simon & Schuster, 85 NY2d 373, 379; see also, Leon v Martinez, 84 NY2d 83, 87-88, supra [court is to "determine only whether the facts as alleged fit within any cognizable legal theory”].) If we determine that plaintiffs are entitled to relief on any reasonable view of the facts stated, our inquiry is complete and we must declare the complaint legally sufficient (see, 219 Broadway, supra).
According to plaintiffs, New York City students are not receiving the opportunity to obtain an education that enables *319 them to speak, listen, read, and write clearly and effectively in English, perform basic mathematical calculations, be knowledgeable about political, economic and social institutions and procedures in this country and abroad, or to acquire the skills, knowledge, understanding and attitudes necessary to participate in democratic self-government (plaintiffs’ amended complaint, record on appeal, at 64-65).
Plaintiffs support these allegations with fact-based claims of inadequacies in physical facilities, curricula, numbers of qualified teachers, availability of textbooks, library books, etc. On the basis of these factual allegations, and the inferences to be drawn therefrom, we discern a properly stated cause of action sufficient to survive a motion to dismiss and to permit this portion of the action to go forward. Taking as true the allegations in the complaint, as we must, plaintiffs allege and specify gross educational inadequacies that, if proven, could support a conclusion that the State’s public school financing system effectively fails to provide for a minimally adequate educational opportunity. We think it beyond cavil that the failure to provide the opportunity to obtain such fundamental skills as literacy and the ability to add, subtract and divide numbers would constitute a violation of the Education Article. In our view, plaintiffs have alleged facts which fit within a cognizable legal theory (see, Leon v Martinez, 84 NY2d 83, 87-88, supra). Accordingly, plaintiffs’ cause of action under the Education Article should be reinstated.
III. — Equal Protection
Judges Simons, Titone, Bellacosa and Levine conclude that the second cause of action alleging that the State’s school financing scheme violates the Equal Protection Clauses of the Federal and State Constitutions (US Const 14th Amend; NY Const, art I, § 11) must be dismissed in light of our decision in Levittown.[5]
In Levittown, we followed San Antonio School Dist. v Rodriguez (411 US 1, reh denied 411 US 959, supra) in holding that education was not a fundamental right under the United States Constitution, and concluded as well that it was not a fundamental right under the State Constitution (57 NY2d, at *320 41-43). Therefore, we held, the rational basis test was the appropriate standard for equal protection analysis under both Constitutions (id.). We concluded in Levittown that any disparities in educational funding among school districts in the State arising from the State’s financing scheme were rationally based upon and reasonably related to a legitimate State interest, "the preservation and promotion of local control of education” (id., at 44).
Plaintiffs attempt to distinguish Levittown in two ways. First, plaintiffs contend that absent from the pleadings and proof in the Levittown case was the claim they make here, that the State’s funding methodology deprives New York City school children of a "minimum adequate education.”[6] Relying on Plyler v Doe (457 US 202, reh denied 458 US 1131), they urge that an intermediate level of scrutiny applies to such a deprivation, thereby shifting the burden to the State to show a substantial relationship of its educational funding scheme to a substantial State interest (see, id., at 224 [Brennan, J.]; see also, id., at 239 [Powell, J., concurring]). This Court today finds this argument unpersuasive for the following reasons.
First, Plyler v Doe does not stand for the broad proposition that heightened scrutiny applies in all State financing challenges, merely when, as here, the gravamen of the plaintiffs’ factual allegations charges violations of the "state-wide minimum standard of educational quality and quantity.”[7] (Emphasis supplied.) Plyler explicitly disclaimed elevating public education to a " 'right’ granted to individuals by the Constitution” (id., at 221; see also, id., at 223). The Court discerns important differences between the instant case and Plyler, i.e., the educational deprivation was absolute in Plyler and was intentionally discriminatory toward a defined subclass, the blameless children of undocumented alien adults. Moreover, the reach of Plyler’s holding was specifically clarified in Kadrmas v Dickinson Pub. Schools (487 US 450), where the Supreme Court explained:
"We have not extended [Plyler’s application of a heightened level of equal protection scrutiny] beyond the 'unique circumstances’, [Plyler v Doe, 457 US, at 239] (Powell, J., concurring), that provoked its 'unique confluence of theories and rationales’ ” (487 US, at 459).
*321 Thus, as to the claimed violation of the Equal Protection Clause of the Federal Constitution, the Court determines that neither Plyler nor any Supreme Court case decided after Levittown requires reexamination of our holding in that case rejecting heightened scrutiny and finding a rational basis in the State’s educational funding scheme.
Alternatively, plaintiffs’ claim that heightened scrutiny is required under the Equal Protection Clause of the State Constitution because, unlike the Levittown plaintiffs, in this case they have alleged that the State’s educational funding methodology has a disparate impact upon African-American and other minority students. The Court rejects this contention, noting plaintiffs’ concession that no discriminatory intent has been charged in this case.[8] The Court relies on the case law from our Court and the Supreme Court holding that an equal protection cause of action based upon a disproportionate impact upon a suspect class requires establishment of intentional discrimination (see, Arlington Hgts. v Metropolitan Hous. Corp., 429 US 252, 264-265; Washington v Davis, 426 US 229, 240; People v New York City Tr. Auth., 59 NY2d 343, 350, supra; Board of Educ. v Nyquist, 57 NY2d, at 43-44, supra).
IV. — Title VI
Plaintiffs also complain that the State public education financing system violates title VI and title Vi’s implementing regulations. Title VI provides:
"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance” (42 USC § 2000d).
Title VI prohibits discrimination on the basis of race or national origin in programs receiving Federal financial assistance (see, 42 USC §§ 2000d — 2000d-6). The Supreme Court has ruled that there must be a showing of intentional discrimination to succeed on a title VI claim (see, Guardians Assn. v Civil Serv. Commn., 463 US 582). Guardians involved a challenge to the hiring and firing practices of New York City’s police department. The principal issue was whether compensa *322 tian could be awarded for a violation of title VI in the absence of proof of discriminatory intent. Although the Court was divided and no majority opinion issued, seven Justices concluded that proof of discriminatory intent is required in order to make out a violation of title VI (see, Alexander v Choate, 469 US 287, 293). The instant complaint contains no showing of intentional discrimination.
Plaintiffs also allege a violation of title Vi’s implementing regulations (see, 34 CFR 100.3 [b] [2]), which provide that recipients of Federal funding may not:
"utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.” (Emphasis supplied.)
The regulations incorporate a disparate impact standard.
Under title Vi’s implementing regulations, proof of discriminatory intent is not a prerequisite to a private cause of action against governmental recipients of Federal funds (see, Choate, supra, at 293-294). Proof of discriminatory effect suffices to establish liability under the regulations promulgated pursuant to title VI: "actions having an unjustifiable disparate impact on minorities [can] be redressed through agency regulations designed to implement the purposes of Title VI” (id., at 293).
Federal courts have consistently held that the evidentiary standards developed under title VII govern title VI cases as well (see, e.g., Georgia State Conference of Branches of NAACP v State of Georgia, 775 F2d 1403, 1417; Groves v Alabama State Bd. of Educ., 776 F Supp 1518, 1523). Consequently, in order to make out a prima facie case of disparate impact:
"The plaintiff first must show by a preponderance of the evidence that a facially neutral practice has a racially disproportionate effect, whereupon the burden shifts to the defendant to prove a substantial legitimate justification for its practice. The plaintiff then may ultimately prevail by proffering an equally effective alternative practice which results in less racial disproportionality or proof that the legitimate practices are a pretext for *323 discrimination.” (Georgia State Conference, supra, at 1417 [citations omitted].)
A validly stated cause of action under the title VI regulations thus has two components: "whether a challenged practice has a sufficiently adverse racial impact — in other words, whether it falls significantly more harshly on a minority racial group than on the majority — and, if so, whether the practice is nevertheless adequately justified.” (Groves, supra, at 1523; see, Georgia State Conference, supra, at 1417; Quarles v Oxford Mun. Separate School Dist., 868 F2d 750, 754, n 3.) Statistics comparing benefit distribution or access patterns among members of the protected class and the over-all population play a key role in demonstrating an adverse racial impact (see, Georgia State Conference, 775 F2d, at 1417 [plaintiffs made prima facie case through statistics showing that the racial composition differed from what would be expected from a random distribution]; Huntington Branch, NAACP v Town of Huntington, 844 F2d 926, 938; Sharif v New York State Educ. Dept., 709 F Supp 345, 362).
Once a prima facie case is established, the burden of persuasion shifts to the defendant to affirmatively defend the challenged practice by way of a legitimate nondiscriminatory reason (see, Larry P. v Riles, 793 F2d 969, 982-983). If the defendant meets its burden and demonstrates that the challenged practice is justified or necessary, the plaintiff can still prevail by showing that "less discriminatory alternatives” were available to further the purportedly legitimate interest (see, Abermarle Paper Co. v Moody, 422 US 405, 425).
Applying the foregoing standards to this case, we conclude that plaintiffs have stated a cause of action under title Vi’s regulations. The Appellate Division dismissed plaintiffs’ claim on the ground that the State’s role in allocating a lump sum to the New York City school system is not the "function which results in the disparate impact on minority racial or ethnic groups; rather, it is the method by which plaintiff Chancellor of the City School District divides and suballocates those funds that may arguably result in the disparate impact complained of here.” (205 AD2d, at 277.) The Appellate Division misconstrued the nature of plaintiffs’ claim.
Plaintiffs complain that it is the State’s decisions concerning allocation of education aid which constitute the "criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race” (34 CFR *324 100.3 [b] [2]). The complaint challenges the manner in which the State allocates education aid, alleging that the present methodology has a disparate impact on the State’s racial and ethnic minorities, the vast majority of whom attend New York City public schools.[9]
The Appellate Division’s reasoning fails to account for the fact that the City can only suballocate what the State allocates to it. If, as alleged, the State allocates only 34% of all State education aid to a school district containing 37% of the State’s students (81% of whom are minorities comprising 74% of the State’s minority student population), then those minority students will receive less aid as a group and per pupil than their nonminority peers who attend public schools elsewhere in the State, irrespective of how the City suballocates the education aid it receives.
Initially, it is undisputed that New York State is the recipient of Federal funds for education. Moreover, plaintiffs complain of a benefit distribution practice which allegedly has the effect of subjecting minority students to discrimination on the basis of their race, color, or national origin. Plaintiffs support their allegations statistically, pointing to the disparity between the total and per capita education aid distributed to the City’s predominantly minority student population as opposed to the amount distributed to the State’s nonminority students. Since defendants have not yet advanced a substantial justification for the challenged practice at this procedural point, plaintiffs’ cause of action under the title VI regulations should be reinstated (see, Georgia State Conference of Branches of NAACP v State of Georgia, 775 F2d 1403, 1417, supra; Groves v Alabama State Bd. ofEduc., 776 F Supp 1518, 1523, supra).
The order of the Appellate Division should be modified, without costs, in accordance with the opinion herein and, as so modified, affirmed.

. Judges Simons, Titone, Bellacosa and Levine have concluded that the community school board plaintiffs lack capacity to bring this suit (see, City of New York v State of New York, 86 NY2d 286 [decided today]), a conclusion with which Judge Smith and I respectfully disagree (see, id. [Ciparick, J., dissenting]). Consequently, all claims asserted on behalf of the community school board plaintiffs must be dismissed and the ensuing discussion applies only to the remaining plaintiffs in this action.

. Plaintiffs have abandoned this claim on this appeal.

. Supreme Court consolidated this action with City of New York v State of New York (86 NY2d 286, supra [decided today]). In City of New York, essentially the same challenges were made to the State’s education funding system as are made here, and Supreme Court dismissed the entire complaint for lack of legal capacity to sue.

. Judge Levine, in his concurrence, also concludes, for his own articulated reasons, that the Education Article requires the State to provide the opportunity of a "sound basic education”. Contrary to his assertions, however, this decision does not extend the State’s funding obligations (see, concurring opn, at 325). Judge Simons, in his dissent, also asserts that the majority opinion would compel a funding directive. However, any discussion of funding or reallocation is premature, because the only issue before the Court at this time is whether plaintiffs have pleaded a viable cause of action under the Education Article. The question of remedies is not before the Court.

. Judge Smith and I respectfully disagree and would sustain the second cause of action under the State Constitution in a separate opinion. Judge Smith, alone, further finds plaintiffs have stated a valid equal protection claim under the Federal Constitution.

. Plaintiffs’ brief, at 30.

. Plaintiffs’ brief, at 30.

. Plaintiffs’ brief, at 39.

. Plaintiffs complain that 74% of the State’s minority student population attend City schools, that minorities make up 81% of the City’s public school enrollment as compared to 17% of school enrollment outside the City, and that the City’s predominantly minority students receive 12% less State aid per pupil ($3,000) than the State-wide average ($3,400).